## ANDERSON v. NIELSON et al.

No. 2511.   Decided December 6, 1913 (137 Pac. 152).

1. MASTER AND SERVANT—PERSONAL INJURIES—ACTIONS—QUESTION FOR JURY. Evidence, in an action against the owner of a private ferryboat for the death of plaintiff's intestate, who was drowned while assisting the owner across with the boat, *held* not sufficient to take to the jury the question whether defendant was negligent in fastening the slack end of a rope, which was attached to a wire cable extending across the stream, to the down-stream south side of the boat, causing the boat to tilt. (Page 572.)

2. MASTER AND SERVANT—INJURIES—ACTIONS—QUESTION FOR JURY.. Evidence, in an action against the owner of a private ferry-boat for the death of plaintiff's intestate, who was drowned. while assisting the owner across with the boat, *held* not sufficient to take to the jury the question whether defendant was. negligent in commanding the deceased to hold onto a rope. (Page 572.)

3. MASTER AND SERVANT—PROXIMATE CAUSE—CONCURRENT CAUSES. Though the premature release of the snubbing rope was a concurring cause with the failure of the man at the rear to release the rope, the owner would still be liable, in the absence of con-- tributory negligence on the part of the deceased. (Page 574.)

4. MASTER AND SERVANT—QUESTION FOR JURY—CONTRIBUTORY NEGLIGENCE. Whether it was contributory negligence for plaintiff's interstate, who was assisting the owner of a ferryboat across a stream, to keep holding to a rope until he was pulled overboard, and after he saw other men letting it go, was a question for the jury. (Page 574.)

5. NEGLIGENCE—TAKING CASE OR QUESTION FROM JURY—NONSUITS. Where there were several different acts of negligence charged in a complaint, either of which would support a recovery, and there was evidence tending to support one of such allegations, the court could properly refuse defendant's motion for a nonsuit and direction of verdict. (Page 575.)

6. TRIAL—INSTRUCTIONS. Where there was evidence tending to support a theory of defendant, it was error for the court to refuse to submit the case on such theory. (Page 575.)

7. MASTER AND SERVANT—ACTIONS—QUESTION FOR JURY. Evidence, in an action against the owner of a private ferryboat for the death of plaintiff's intestate, who was drowned while assisting the owner across with the boat, *held* not sufficient to take to the jury the question whether defendant was negligent in prematurely ordering the release of the snubbing rope. (Page 577.)

STRAUP, J., dissenting in part.

APPEAL from District Court, Seventh District; *Hon. A.. H. Christensen,* Judge.

Action by Alice Anderson, administratrix of the estate of Mads Madsen, deceased, against Swen O. Nielson, and others.

Judgment for plaintiff. Defendant named appeals.

REVERSED AND REMANDED.

*C. S. Varian* for appellant.

*Lewis Larsen,* and *W. H. King* for respondent.

STRAUP, J.

This is an action to recover damages for the death of plaintiff's intestate alleged to have been caused by the negligence of the defendant Neilson and the defendants the Little Valley Land Company, the Little Valley Irrigation Company, and the Neilson Land & Water Company, corporations. The jury rendered a verdict in her favor against Nielson. He appeals.

The death was occasioned in the operation of a ferryboat across Green River in Emery County. The stream at the ferry coursed in a southerly direction, and at the time of the accident was from 400 to 500 feet wide, two or three feet deep along its banks and seventeen to twenty-five feet at the middle. Nielson owned the ferryboat; also the ferry. The boat was operated across the stream from east to west. It is not claimed that the defendants, or either of them, were common carriers, or that the boat was operated for the use of the public. It was operated alone for the use and benefit of Nielson and his codefendants, owning ranches and lands on the east side of the river. The boat was about thirty-seven feet long, thirteen feet wide, and two feet deep. It was equipped at each end with an apron so attached as to be raised in crossing the stream and lowered for a passageway in getting or driving on or off the boat. The witness spoke of it as having two decks; the upper, and upon which everything was carried, being but seventeen inches above the other. On each side was a railing about three feet high. The one on the north, or upstream, was strongly constructed and securely fastened to the boat. To that railing were the ropes and blocks and tackle attached. The lower railing was not so firmly constructed. Suspended across the stream about

fourteen feet above the bank or high water was a cable firmly secured on each bank. The boat, by block and tackle, one at or near each end and on the north side of it, was attached to the cable, one pulley of each block resting on the cable, with ropes passing around the lower pulley of that block and the pulley of the lower block and tied to the north railing. Drawing the forward end of the boat near or under the cable by means of the rope and block, and loosening or letting out the rope at the backward end and letting that end of the boat move down stream a greater distance from the cable than the forward end, the boat was carried by the current across the stream. On each bank were two snubbing posts about ten feet apart, one for high, the other low, water. The operation of the boat was simple and readily understood. The accident occurred in March, when the waters of the stream were high, the rising of them caused by a thaw and breaking of ice three or four days prior thereto. The current was from four to five miles an hour, moving more rapidly in the middle of the stream than at the shore.

The testimony, both on the part of the plaintiff and the defendants, shows that in leaving the shore the usual and proper manner of operating the boat was first to draw the forward end of the boat, the end farthest in the stream, to the desired position near or under the cable, and then tie or hitch the rope with which the boat was drawn to such position to the north railing. To properly do that it was necessary to loosen or let out the rope at the backward end or tackle, to allow that end of the boat to move the desired distance down stream and away from the cable as the forward end was drawn up. Then the rope at the snubbing post was released, and the boat by the current carried forward. The forward end remained fixed as tied until the boat approached the opposite shore. In crossing, the rope at the rear tackle was let out or drawn in according to the desired speed, allowing the hind end of the boat to move a certain distance down stream from the cable, increasing the speed and drawing it up toward the cable diminishing it. As the boat approached the opposite

shore the rope at the forward tackle was loosened and let out to allow the forward end of the boat to move downstream and away from the cable a sufficient distance to make a square landing. The snubbing rope was then tied to the snubbing post, the boat held in position, and the apron lowered to get or drive on or off the boat. In leaving the shore to cross the stream it was further shown that to release the snubbing rope and to allow the boat in high water to move forward before the forward end was drawn to the required position and the rope at the forward tackle tied to the railing was dangerous, and rendered it difficult, as the boat encountered the more rapidly moving current, to draw the forward end in position to properly and safely carry the boat across the stream.

Nielson had in his employ eight or ten men working on his ranches. The deceased was in his employ, and was a sort of foreman in charge of the other men when Nielson was not there. In Nielson's absence the deceased directed and controlled the management of the boat, and, with the assistance of other men, operated it. No point is made that he did not understand the proper handling and management of the boat. When Nielson was present he directed the operation and management of it. On the morning of the day of the accident Nielson, who was at the ranch on the east side of the river, with the assistance of the deceased and other men, took the boat from the east shore to the west shore of the river to there meet C. They conveyed him and his horse and buggy to the east side. There he inspected the soil of one of the ranches to ascertain its qualities for fruit raising. Shortly after noon of that day he and his horse and buggy were conveyed back to the west side. Nielson, the deceased, and three other men operated the boat. From there C. and Nielson intended to drive to the railroad station at Green river; the deceased and the other men to return to the east side with the boat. The west side was reached, and the boat snubbed to the post. C. drove the horse and buggy off. As Nielson was about to leave, the snubbing rope, which had not been securely fastened to the post, released, causing the west end of the boat to move downstream and the boat to be carried out in

the stream. There were then on the boat Nielson, the deceased, and three other men. They were unable to draw the west end of the boat up to the cable to permit the boat to be carried back to the west shore. They, therefore, left it in the position with the east end nearer the cable, and were carried back to the east shore, where they intended to put the boat in the required position to be carried back to the west shore, to permit Nielson to land to go with C. On reaching the east shore the boat was snubbed to the post by two men on the bank, one of them the deceased's son.

Up to this point the evidence is without substantial conflict. But from here there is some conflict in the evidence. As testified to by some of the plaintiff's witnesses, it was more dangerous to operate the boat in high water than in low water, and that because of the high water Nielson and others, several days before the accident expressed apprehensions of danger in operating the boat until the high waters of the stream had subsided. But the only inference deducible on the record is that the deceased as fully comprehended and realized that danger as did Nielson. The evidence further on behalf of the plaintiff shows that Nielson, in preparing to leave the east shore to return to the west shore, before the forward end of the boat (the west end) was drawn to the proper position and the rope fastened to the railing, looking in the direction of the men at the snubbing post, called out, "Boys, let her go," or, "Let it go." The men on the bank, seeing that the front end of the boat was not in proper position, hesitated. Nielson again said, rather sharply or impatiently, as expressed by some of the witnesses, "Let it go," or "Boys, let her go." Thereupon the snubbing rope was released, the deceased and two other men having hold of the forward rope or tackle endeavoring to draw the forward end to the cable and in position. The boat moved forward. One of the witnesses testified it "shot out;" others, of plaintiff's witnesses, that it "moved as usual." The deceased and the men at the forward rope were unable to draw the forward end of the boat to the proper position. Nielson took hold of the rope and assisted. Some of the witnesses on the bank tes-

tified that as the boat was moving out they saw the slack of
the forward rope over the south rail; one of them that Niel-
son put it around the rail; another, that it appeared tied to
that rail. The men at the rope, with Nielson's assistance,
were unable to draw the forward end of the boat in position.
The boat drifted out in the stream about 100 or 125 feet,
the current driving the forward end downstream farther from
the cable, causing the deceased and the other men holding the
rope to be drawn up and against the north railing. As some
of the witnesses expressed it, the boat swerved, the front end
suddenly cast downstream the length of the rope, and the de-
ceased, who still had hold of the rope, was thrown or pulled
overboard and drowned. After the front or west end of the
boat had been driven downstream the full length of the rope
and there securely held by it and the east end held nearer the
cable, the movement of the boat was reversed, which by the
force of the current against it was then safely carried back
to the east shore.

According to the defendants' evidence, as the boat was
about to leave the east shore to return to the opposite side,
two men were on the bank at the snubbing post, one man on
the boat at the east end, hold of the rope at the backward or
east tackle, the deceased and two other men at the west end
of the boat, hold of the rope at the forward tackle, and Niel-
son near them at the west end of the boat. Nielson, address-
ing and looking at the man at the east or rear tackle, said to
him, "Let that rope go," or, perhaps, "Let her go," meaning
to let the rope out at that tackle so that the east end of the
boat would move downstream to enable the men at the for-
ward tackle to pull the west or forward end of the boat to
the required position. The men on the bank, mistaking the
order, and taking it as addressed to them, released the snub-
bing rope, causing the boat to move out before the front end
was in position and the rope tied to the railing. Nielson, ob-
serving that the deceased and the two men pulling on the rope
at the forward tackle were unable to draw the front end of
the boat in position, immediately went to their assistance and
helped pull on the rope. He testified that he did not put the

rope around the south railing, and that it was not attached or tied to that rail. The deceased, as the boat started to move out, several times called out to the man at the rear tackle, "Let that rope go," meaning to loosen or let it out to permit that end of the boat to move downstream and thus enable the men to pull the forward end of the boat up. The rope at the rear tackle was not released, or not sufficiently let out, to enable the men at the forward rope to draw the front end of the boat up, which was gradually by the current driven downstream, and the men at the forward rope gradually drawn up towards the north railing. When the boat had moved out about 100 feet from the shore, and the front end had been driven downstream about the full length of the rope, and the men drawn up against the railing, some of them let loose. The deceased, still holding to the rope, was pulled up and thrown into the stream. The boat then safely returned to the east shore, as heretofore stated.

The alleged acts of negligence are:

(1) That Nielson negligently ordered the boat released at the snubbing post before the boat was in proper position, and before the rope at the front end had been tied to the railing; (2) that Nielson negligently tied the slack of the rope at the front tackle to the south railing of the boat, causing that side at the front end to be raised and the north side lowered, the boat to tilt or dip; (3) that Nielson, without notice or warning, untied and released the rope on the south railing, causing the boat to be suddenly jerked and the deceased thrown overboard; (4) that Nielson negligently required and commanded the deceased to stand near the front end of the boat and near the north railing, and there, in a perilous position, to take hold of and pull on the rope.

At the conclusion of the plaintiff's evidence the defendants severally moved for a nonsuit, on the grounds of insufficiency of the evidence to show negligence, and that upon the evidence it was shown that the death was caused by mere accident, or by the deceased's negligence. The motion was granted as to two defendants, and denied as to two, Nielson and the Little Valley Irrigation Company. Upon the same

grounds the last-named defendants, at the conclusion of all the evidence, severally moved the court to direct a verdict in their favor. This motion was also denied, and the case submitted to the jury, who rendered a verdict against the defendant Nielson alone. He complains of these rulings, of portions of the charge, and of the refusal to charge as requested by him. He also urges that the verdict is in disobedience of the charge, and hence is against law.

I think there is sufficient evidence to support the first allegation of negligence, but not the second, third, or fourth. As to the second and third, there is evidence—the testimony of some of the witnesses on the bank, plaintiff's witnesses—that the slack of the forward rope on which the men at the front end of the boat were pulling was over the south rail of the boat, one of them testifying that after the boat had moved out Nielson put the rope "over the south rail," but did not see him pull on it nor take it off. Another testified that Nielson had hold of the rope, that the other three men were pulling on it, and that he "tried to put the rope around the lower rail," but that it was not at any time fastened to that rail. Another was asked by plaintiff's counsel: "Now, what is the fact as to whether or not, when the boat was out in the water, the rope was attached to the lower rail?" The witness answered: "I don't know whether it was fastened or not. Q. Well, how did it look to you? Describe its appearance, if you took any particular notice. A. Well, it appeared to me as though it was tied." But he further testified that he thereafter saw the rope "lying on the deck (not attached) as the front end of the boat started downstream," and saw the four men pulling on the rope as the current drove the front end of the boat downstream, drawing the men up to the north railing, when three of them let go of the rope, but could not say whether the deceased held on or let go at the time he went overboard. It was shown that to attach the rope to the south rail, with the current moving against the boat on the north side and driving the front end downstream, tended to tip or tilt the boat. But this witness was asked by plaintiff's counsel: "State whether or not the

boat was tipped in any way." He answered: "I cannot tell you that. Q. How did it appear to you? Did it appear to be tipped in any way? You said it looked as though it was tied on the south rail. Describe how it was. A. I couldn't see. Q. Well, I say, it appeared to be tied? In what kind of a knot? A. I couldn't say whether it was wrapped around the rail or whether it was tied." Other witnesses on the bank testified that before the deceased went overboard the boat swerved, as described by them, the front end driven downstream by the current, and by others that the front end or north side dipped, causing water to run on the boat either at the front end or over the north side. Now, this is some evidence tending to show that Nielson put the rope around the south rail, and that the boat dipped or tilted. But it does not show that he fastened the rope to that rail, or that putting the rope around that rail was the cause of the boat's dipping or tilting; nor does it show or support the allegation that he, without notice or warning, suddenly released the rope, thereby causing the boat to be jerked or tilted and the deceased thrown overboard. That is, the evidence does not sufficiently, but only vaguely, show that the deceased, from any such cause, was thrown overboard. And a vague or uncertain cause is not a reasonable or probable cause. This is especially so when, by the testimony of all the witnesses testifying upon the subject, it is shown that just before the deceased went overboard the four men were all pulling on the rope the end of which then was lying on the deck, and, notwithstanding their combined efforts, the current drove the front end of the boat farther downstream the full length of the rope, drawing the men up against the north rail, and as some of them let loose, the deceased, still clinging to the rope, went overboard. I do not find evidence to justify any other conclusion, and find no sufficient evidence to justify the conclusion that Nielson, by attaching the rope to the south rail and suddenly releasing it, jerked or tilted the boat, and that the deceased, from such a cause, was thrown overboard.

Now, as to the fourth allegation. There is no evidence whatever that Nielson, on the occasion in question, at any

time or in any particular, directed or commanded the deceased, or said anything to him, or that the deceased, because of anything that Nielson said or did, took hold of the rope, or pulled on it, or did anything. He was at the forward rope and had hold of it, and was pulling on it before the snubbing rope was released, and before the boat moved out, and there he remained, without anything whatever being said to him by Nielson, until he went overboard.

I think there is sufficient evidence to support the first allegation of negligence that Nielson directed and ordered the rope at the snubbing post released before the front end of the boat was in position and the rope at the **3, 4** forward tackle tied to the rail. Of course the defendant's evidence shows that the order or direction was given to the man at the rear tackle, to let out that rope. But there is evidence on behalf of the plaintiff to show that the order was given to the men at the snubbing post to release that rope, which, in obedience to the order, was released, and that it was dangerous and unsafe to do that before the forward end of the boat had been drawn to the proper position and the forward rope tied to the rail. There is, however, the further question—that of proximate cause. It is contended by the defendant that the deceased's going overboard was not caused by the premature releasing of the snubbing rope; but that the direct cause, the probable, the proximate cause (if his going overboard was not accidental nor due to contributory negligence), was the failure of the man at the rear tackle to release that rope which did not permit that end of the boat to move downstream and prevented the front end from being drawn up. The current moving more rapidly towards the middle of the stream than at the shore, it is urged that had the rope at the rear tackle been released the front end of the boat would have been drawn in position, and the forward rope tied to the rail, before the boat had moved far and encountered the current where it was moving rapidly. There is evidence to show that the rope at the rear tackle was not released or let out, or at least not sufficiently let out, to permit that end of the boat to move downstream, though the deceased

twice commanded the man at that rope to let it out.   What testimony there is to dispute it comes from witnesses who but say they did not notice or see any one at the rear tackle. Still that does not tend to disprove the fact that the rope at the rear tackle was not sufficiently let out to permit that end of the boat to move downstream.   It is not alleged or claimed that the defendant was responsible for that.   The case is argued and submitted on the theory that he was not.   Nevertheless, that the front end of the boat could or would have been drawn in proper position, and the boat safely carried across the stream had the rope at the rear tackle been sufficiently let out, is matter of argument and inference.   And though such inference be reasonable and probable, still the deduction was a question more properly falling within the province of the jury.   Then there is the further question of sole cause, or concurring causes.   If Nielson's act, prematurely directing the snubbing rope to be released, was a contributing cause of the deceased's going overboard, then, in the absence of contributory negligence, must he be held responsible, though his act was not the sole, but a concurring and combined, cause with the failure of the man to release the rope at the rear tackle.   Of course, it is argued that the failure to release the rope at the rear tackle was an intervening and the sole cause, with which the premature direction to release the snubbing rope did not concur or combine. But again, that is matter of argument and inference.   I, therefore, think the question of proximate cause was one of fact.

I do not see anything in the evidence to justify a holding that the deceased, as matter of law, was guilty of contributory negligence.   The claim is made that, he being familiar with the operation of the boat, realizing the inability of all of the men to draw the front end up, seeing the rope slip through their hands as the front end of the boat was farther and farther driven downstream by the current, and, seeing the men releasing their hold as they with him were drawn up against the railing, negligently clung to the rope and was pulled overboard.   I think that, too, was

for the jury. I, therefore, am of the opinion that the plaintiff was entitled to go to the jury on the first allegation of negligence, and hence the court properly overruled the motions for nonsuit and direction of the verdict. But the court erred in submitting the case on the other allegations of negligence. The defendant, however, is not in position to complain of such submission, except as to the issue presented by the last allegation. He cannot complain of the rulings refusing the motions referred to if there was sufficient evidence to support any of the allegations of negligence. As to the last, the fourth, he specifically requested the court not to submit to the jury that issue, on the ground that there was no evidence to support that allegation. The court refused the request and submitted such issue. And, as has been seen, there being no evidence whatever to support that allegation, the ruling clearly was erroneous. As to the second and third allegations of negligence, no such request was made, except as was embraced in the motions for nonsuit and direction of the verdict—to take the whole case from the jury upon all the issues presented by the complaint.

Complaint is also made of the court's refusal to charge on contributory negligence as requested by defendant. The court gave the jury, in substance, every principle embodied in the defendant's request, and sufficiently and properly charged them on that subject.

The defendant requested a submission of the case on the theory that he was not responsible for the premature releasing of the snubbing rope, if the order given by him was directed to the man at the rear tackle but was misunderstood by the men at the snubbing rope, and that rope prematurely released because of such misunderstanding or mistake, as did the plaintiff on the theory that the defendant was responsible if the order given by him was directed and given to the men at the snubbing post. The court submitted the case on both such theories. The defendant, in addition, also requested the court to submit the case on the theory that the failure of the man to release the rope at the rear tackle, and who had been commanded to release it, was the cause of the accident. The

court refused that request, and did not submit the case upon such theory. The court erred in that. The defendant was just as much entitled to go to the jury upon that theory as was the plaintiff upon her theory that the proximate cause of the accident was the premature releasing of the snubbing rope at the direction of the defendant. The charge shows a submission of the case upon all the theories of the plaintiff, some of which are not even supported by evidence, but the want of a submission on theories of the defendant, though supported by evidence.

For these reasons I think the judgment should be reversed, and the case remanded. In that my Associates concur, but not in the conclusion that there is sufficient evidence of negligence to carry the case to the jury. The judgment of the court below is therefore reversed, and the case remanded for a new trial. Costs to the appellant.

McCARTY, C. J.

I fully concur with Mr. Justice Straup except his conclusion that the motions for a nonsuit and a directed verdict were properly overruled. I think the evidence, considered in the light most favorable to plaintiff, wholly 7 fails to show any negligence on the part of Nielson in his supervision of the management of the boat on the occasion in question. The evidence shows that the current—flow of the water—is much stronger on the west side of the river than it is on the east. Frank Tucker, a witness for plaintiff, testified regarding what occurred on the boat at the time of and immediately prior to the accident, in part, as follows: "I think Madsen must have stood closest to the rail. . . . After the others let go, as I saw it, Madsen was drawed up until his feet got in contact with the railing. I saw his foot hit the top of the rail. He had hold of the rope as he went up, the rope pulling him up, I saw his hat go off, and almost immediately he went over."

Byron Mower, another of plaintiff's witnesses, testified regarding the position and movement of the boat, and as to what occurred thereon on that occasion, as follows:

"The boat was in position so that the pressure of the water forced it forward in the usual way, with the hind end down the river lower than the front end. The boys on the rope were struggling to get it up, but had not quite got it tied to the rail. Madsen was holding onto the rope, which drew him up onto the rail with his hand still onto the rope, and I saw his feet, or one foot, on the rail in this (indicating) position, and then both feet on the rail, and then I saw him go over. At this time the rope at the east end was not slackened. I don't think it was. If it had been it would not have gone down the stream and there would have been no trouble in pulling up that forward tackle. *One or two men could have pulled it up.*"

While this witness testified that he did not think the tackle nearest the east end of the boat was released or slackened before the boat left the shore on the occasion in question, on being further interrogated by plaintiff's counsel he testified as follows:

"Q. Do you mean to state that when the boat came into this shore [referring to the east shore] they didn't release, in order to land, the tackle, which would be the east tackle? A. I don't know whether they did or not. Q. Well, could they land without releasing it? A. Not square up against the bank. Q. And you stated that they did land square against the bank? A. I think they did. Q. Was it released? A. It must have been. Q. Did you ever see them land without releasing it? A. No, sir. . . . Q. If the tackle were released as it came in, the front tackle as it came up, which would be the rear tackle as it went out, would there be any necessity of releasing it before the snubbing post was released, and until the boat had gotten out some distance into the water? A. I don't think so. Q. Was there anything to release until the boat had been drawn up to the cable and the rope tied there and the snubbing rope released? A. No, there was nothing to release after you released the snubbing

rope. Q. Now, was there anything to be released before that? A. No, sir."

The foregoing, as well as much other evidence introduced by plaintiff, shows that as the boat is brought to a landing the rope of the forward tackle is loosened and the forward end of the boat permitted to move downstream until the boat is at a right angle with the shore or landing, the rope of the tackle is then fastened to the railing of the upper side of the boat. The boat is then held against the landing by means of a rope attached to the snubbing post. Preparatory to taking the boat to the opposite side of the river, the end extending into the river is drawn upstream toward the cable until the position of the boat is reversed from what it was when it came from the landing on the opposite side of the river; that when the boat was thus reversed it was the usual and customary practice in the management of this particular boat to fasten the rope by which the end of the boat had been moved upstream to the upper railing, and then release the rope from the snubbing post, permitting the boat to be propelled into and across the river by the force of the current. On the occasion in question this method of handling the boat was followed, except that the rope was released from the snubbing post before the rope of the forward tackle was fastened to the railing. In other words, at the time the rope was released from the snubbing post, the boat was in position for crossing the river, and the only thing remaining to be done to make the preparations complete was the fastening of the forward tackle rope to the railing. This, I think, is made plain by the testimony of all of the witnesses who were present and saw the accident. Each of these witnesses, excepting one, testified that when the rope was untied from the snubbing post the boat moved forward in the "usual way." Two witnesses testified that it "moved at the usual rate of speed." In order for the boat to move in the usual way and at the usual rate of speed it necessarily would have to be in the "usual" position. The only evidence in the record that can be said to be in conflict with the foregoing was elicited from one of plaintiff's witnesses by her counsel as follows:

"Q. Were they [referring to Madsen and his assistants, who were trying to swing the west end of the boat upstream] still pulling when the boat shot out into the stream? A. Yes, sir. They were holding the rope." The conflict between this and the testimony of the witnesses mentioned is more apparent than real, because if the boat on being released "shot out into the stream," it would indicate that the east end of the boat was down the stream a sufficient distance to cause the current to force the boat forward at an unusual rate of speed, and that there was no necessity for loosening the rope of the east, or what at this time was the rear, tackle. This evidence, therefore, supports the only conclusion which I think is permissible under the evidence, namely, that all that remained to be done when the boat was released from the snubbing post was the tying of the west cable rope to the railing. The evidence shows that the boat had proceeded anywhere from 100 to 166 feet before the accident occurred. The evidence without conflict also shows that ordinarily one or two men can manipulate the forward tackle and move the front end of the boat towards the cable, and place the boat in proper position for crossing the river. On the morning of and just prior to the accident, the boat was released from the landing on the west side of the river before the forward end of the boat had been moved upstream and placed in the usual position. Four men, notwithstanding the current of the river is much stronger on that side than it is on the east side of the river, succeeded in pulling the east end of the boat upstream and placing it in the usual position for crossing the stream. One witness, who was on the boat at the time of the accident, testified:

"I was not surprised when the boat started before the west end rope was tied. I had seen it done before when the water was just as high as it was on that day."

The evidence which I have quoted fairly reflects, as I read the record, the circumstances under which the accident occurred. I think the only inference permissible from the undisputed facts is that the death of Madsen was due to an accident for which no one was or is responsible. Assuming,

for the sake of the argument, that the releasing of the rope from the snubbing post before the west end of the boat was moved upstream, the forward tackle adjusted, and the rope tied, was negligence, such negligence was not the proximate cause of the accident. The releasing of the rope from the snubbing post and permitting the boat to move forward into the stream created no element of danger on the boat that would not otherwise have existed. As herein pointed out, the boat; after it was released from its moorings, moved forward into the stream in the usual way and at the usual rate of speed of from 100 to 166 feet before the accident happened, and any moment after it was discovered that the current was carrying the west end of the boat downstream, if Madsen and the other parties who had hold of the rope with him had ceased pulling and let go of the rope and permitted the boat to reverse itself and float back to the landing from which it had just been released, the accident, in all probability, would not have happened. But instead of doing this, Madsen, after those who were pulling on the rope with him had released their hold, continued to hold to and pull on the rope until he was dragged or pulled over the railing of the boat into the river. One of the plaintiff's witnesses testified on this point as follows:

"I saw Madsen, Ostenson, and Tucker pulling on the rope, and at one time saw Nielson pulling, and as they got toward the rail one after the other had to let go, and Madsen didn't let go. Madsen was holding onto the rope which drew him up onto the rail with his hands still on the rope."

Nielson testified that at the time Madsen was pulled or thrown into the river the boat had reversed its course and was moving back to the landing from which it had a moment or two before been released. While no other witnesses testified directly on this point, yet some of plaintiff's witnesses testified to facts which seem to corroborate Nielson's testimony. James B. Graham, a witness for plaintiff, testified that just before Madsen was drawn overboard "the rope kept getting away from (Madsen and the other parties who were pulling on the rope) until the boat got in line with the cur-

rent and the water started coming over" onto the boat, and that it was after the water came onto the boat that Madsen was pulled, or, as stated by the witness, "thrown into the water." It necessarily follows, in fact the evidence without conflict shows, that immediately after the boat was drawn or forced in "line with the current," its position was reversed, and it started to move back to the east landing. I do not claim that Madsen was guilty of contributory negligence in holding onto the rope until he was pulled overboard, but I do say his acts and conduct in holding onto the rope under the circumstances approach much nearer the border line of negligence than anything that Nielson did on that occasion. For these reasons, with those of Mr. Justice Straup, I concur in the reversal of the judgment.

FRICK, J.

If it be true, as stated by Mr. Justice Straup, that there is sufficient evidence of negligence on the part of Mr. Nielson to authorize the submission of that question to the jury, and, further, that there is sufficient evidence respecting the quesion of what was the proximate cause of the accident, then I concur in all of the conclusions reached by him. I cannot yield assent, however, to the propositions that there is sufficient evidence respecting Mr. Nielson's negligence, or, if there be any, that the jury was authorized upon the whole evidence to say that anything that Mr. Nielson said or did caused or was the proximate cause of the death of the decedent.

From a careful scrutiny of the whole record, the whole substance of which is very clearly stated by Mr. Justice Straup, I am forced to the conclusion that to say Mr. Nielson is to be charged with the unfortunate accident rather than the deceased or any one else present at the time is mere conjecture. In my judgment that is also true with respect to what really was the proximate cause of the accident, whether it was Mr. Nielson's act or the act of someone else. True it is that the foregoing questions are ordinarily for the jury. It is, however, also true that where, as in this case, a verdict must

necessarily rest upon mere conjecture, then it cannot stand; and, if it cannot be permitted to stand, the question should not have been submitted to the jury.

In my judgment the unfortunate occurrence was one of those unlooked for and unexpected accidents for which no one can be held legally liable. The record clearly shows that if it required any knowledge or skill to manage the boat, all who took part in its management at the time, including the deceased, knew quite as much about the handling of it and the danger, if any, incident thereto as did Mr. Nielson. They were therefore all upon an equal footing. The alleged negligence, whether of acts of commission or of omission, all occurred at the time of the accident. The witnesses all agree that the whole thing occurred so quickly that they hardly appreciated that it happened. There was no time for thought or reflection. What was done, therefore, was done, or had to be done, upon the spur of the moment. Under such circumstances, the law does not characterize mere error of judgment as negligence; and, if this be so, a jury may not do so.

If the decedent had not been thrown over the side rail of the boat, then, in my judgment, no one would have thought of charging Mr. Nielson with negligence, although his acts and conduct would have been precisely what the witnesses say they were. In my judgment the whole matter of negligence is an afterthought, arising out of the sole fact that the deceased fell overboard and lost his life.

In view of the foregoing, while I concur in the reversal of the judgment, yet I am also of the opinion that under the evidence as it now stands the court should have granted the motion for a nonsuit or should have directed a verdict in favor of Mr. Nielson.